T.C. Memo. 1999-69

UNITED STATES TAX COURT

DANIEL FRANCIS KELLY, JR., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 750-97.                          Filed March 8, 1999.

Timothy F. Kelly, for petitioner.

Ann M. Welhaf, for respondent.


MEMORANDUM OPINION

COUVILLION, Special Trial Judge:  This case was heard
pursuant to section 7443A(b)(3)[1] and Rules 180, 181, and 182.

Respondent determined deficiencies of $3,850 and $1,063 in
petitioner's Federal income taxes for 1991 and 1992,
respectively.

---

[1]     Unless otherwise indicated, section references are to the
Internal Revenue Code in effect for the years at issue.  All Rule
references are to the Tax Court Rules of Practice and Procedure.

The sole issue for decision is whether, for 1991 and 1992, petitioner is entitled to deduct, under section 162(a), as trade or business expenses, legal expenses incurred in defending a criminal sexual assault charge against him.

Some of the facts were stipulated, and those facts, with the annexed exhibits, are so found and are incorporated herein by reference. At the time the petition was filed, petitioner's legal residence was Phoenix, Arizona.

During the years at issue, petitioner was employed as the chief financial officer of Gosnell Builders Corp. (GBC), an Arizona corporation whose principal business was the ownership and development of resort properties in Arizona and Southern California. One of the several upscale golf resorts owned by GBC in the Phoenix, Arizona, metropolitan area was known as The Pointe South Mountain Resort (The Pointe).

The incident that gives rise to the issue in this case occurred on the evening of June 12, 1991, when petitioner and two other executives of GBC were entertaining two GBC clients at the Sports Club located at The Pointe. During the course of the evening, the group consumed a considerable amount of alcoholic beverages. Petitioner and his group encountered three women, who were also patrons at the Sports Club and who, themselves, had imbibed a considerable amount of alcoholic beverages. Petitioner and his group purchased several rounds of drinks for the women. In the course of the evening, petitioner paid particular attention to one of the three women, who is referred to as Jane

Doe.[2]  As the evening progressed, it became evident to petitioner that the three women should not drive home from the Sports Club because of their inebriation.  GBC had a company policy that allowed employees to arrange for a complimentary room at a hotel that was part of The Pointe complex for patrons who were intoxicated.  The parties referred to this policy as the "take the elevator home" policy, and it was intended to protect GBC from liability should such guests cause harm to themselves or others after leaving the Sports Club intoxicated.  Petitioner suggested to the women that he procure such a complimentary room for them, which they initially declined.  Petitioner and his group continued socializing with the women and purchased them additional drinks.  Later in the evening, Jane Doe became sick due to her consumption of alcohol.  The women agreed to accept petitioner's complimentary room offer and suggested that he reserve the room and bring them the key.  Petitioner declined to do that, insisting that the women accompany him to procure the room.  After a few more rounds of drinks and socializing, one of the women, a Ms. Gavirati, observed petitioner leaving the Sports Club with his arm around a groggy and stumbling Ms. Doe.  Ms. Gavirati suggested to their third woman companion, a Ms. Johnson, that Ms. Johnson pursue petitioner and Ms. Doe.  Ms. Johnson did that, and, after being advised that they were going to procure

_____

[2]  Jane Doe was the alleged victim of the alleged sexual assault.  That name is fictitious as the Court, for reasons of privacy, does not use the actual name of the alleged victim.

the room, she and Ms. Doe rode with petitioner in his car for the short distance to the hotel lobby, where petitioner checked out a room, in his name, for use by the three women. Petitioner returned to his car, where the two women waited, and, together, they walked to the hotel room. Petitioner and Ms. Johnson had to assist Ms. Doe to the hotel room, where she was placed in bed. After a few minutes, Ms. Johnson and petitioner left in petitioner's car to return to the Sports Club. On the way, however, petitioner stopped at the hotel lobby and stated to Ms. Johnson "wait right here, I need to take care of something" and proceeded to the registration desk, where he conversed briefly with the clerk. Although petitioner denies this, it is alleged that petitioner obtained a second key to the hotel room at that time. Petitioner did not disclose to Ms. Johnson the object or purpose of his conversation with the desk clerk. Following this stop, petitioner drove Ms. Johnson back to the Sports Club, and she exited the car. Petitioner advised Ms. Johnson that he was going home and would not return to the bar. Upon returning to the Sports Club, Ms. Johnson reunited with Ms. Gavirati and some of the other persons with whom they had been socializing earlier in the evening. By this time, the other GBC executives and clients had departed. Ms. Johnson and Ms. Gavirati continued to socialize at the Sports Club for anywhere from 20 minutes to an hour and then suggested to some of their new found friends that they go to the hotel room to party, since there was a stocked minibar in the room.

When the group arrived at the hotel room, Ms. Gavirati decided she would go home and called a taxi to take her home. Just prior to Ms. Gavirati leaving the room, Ms. Doe began calling out for Ms. Johnson to come and talk to her. Ms. Gavirati paid little attention to Ms. Doe because she thought Ms. Doe was upset because of her intoxication. Ms. Gavirati left without seeing Ms. Doe. When Ms. Johnson entered the bedroom, Ms. Doe was crying hysterically and kept saying "I thought you were <u>him</u> coming back". After further inquiries from Ms. Johnson, Ms. Doe replied that, sometime after petitioner and Ms. Johnson left the hotel room, Ms. Doe thought she heard the door to the room open and close. Ms. Doe explained further that she then groggily awakened to find petitioner hovering over her. Ms. Doe detailed acts of sexual assault and rape that she alleges petitioner perpetrated on her. Ms. Doe stated that she tried to scream and kick petitioner but he completely overpowered her.[3] Ms. Doe stated that she wanted to get out of that room immediately, and Ms. Johnson agreed.

Ms. Johnson informed her new-found friends that they were all going to leave the room and asked them for a ride to her car, which had been left in the parking lot at the Sports Club. The friends took Ms. Johnson and Ms. Doe to their car. Ms. Johnson drove home and immediately called the police to report the

---

[3] Ms. Doe was approximately 5 feet 2 inches tall and weighed 96 pounds. Petitioner, on the other hand, was approximately 5 feet 10 inches tall and weighed about 260 pounds.

alleged sexual assault and rape. The two women then proceeded to a hospital where Ms. Doe was examined with a "rape kit", and both were questioned by the police. The police obtained a search warrant for the hotel room where they seized certain pieces of evidence.

Petitioner was arrested and charged with the sexual assault of Ms. Doe and was indicted by a grand jury on charges of sexual assault. In March 1992 the prosecutor's office filed a motion to dismiss the sexual assault charges against petitioner due to a lack of "sufficient evidence at this time to present to a jury and prove the case beyond a reasonable doubt". The prosecutor's motion was granted, and the court entered an order dismissing the charges. Petitioner spent $45,431 of his personal funds defending the criminal charges against him. No part of these expenses were reimbursed by petitioner's employer, GBC.

On June 12, 1992, Ms. Doe filed a civil action against petitioner, GBC, The Pointe, various insurance companies, and other entities and individuals owned or employed by GBC or any of its subsidiaries. In her civil suit, Ms. Doe alleged various injuries and damages incurred by her as a result of the sexual assault by petitioner. After the filing of various pleadings and completion of discovery, the defendants made out-of-court settlements with Ms. Doe. On November 3, 1993, petitioner and his personal liability insurance company, United Services Automobile Association (USAA), entered into an out-of-court settlement with Ms. Doe that called for the payment of $30,000 to

Ms. Doe. The entire $30,000 was paid by USAA, as well as petitioner's legal expenses incurred in defending the civil suit. On that same date, GBC and its insurance companies and other related entities and employees entered into an out-of-court settlement with Ms. Doe that called for the payment of $90,000 to Ms. Doe, the full amount of which was paid by the insurance companies.

On Schedule C, Profit or Loss From Business (Schedule C), of his 1991 Federal income tax return, petitioner claimed a deduction of $13,737 for legal expenses incurred in the defense of the criminal sexual assault charges. On Schedule C of his 1992 Federal income tax return, petitioner claimed a deduction of $31,694 for legal expenses incurred in the defense of the criminal sexual assault charges.

In the notice of deficiency respondent disallowed petitioner's $13,737 legal expense deduction for 1991 and the $31,694 legal expense deduction for 1992. Respondent made several additional adjustments to petitioner's 1992 return that are not at issue in this case.[4]

---

[4] For 1992, respondent disallowed $1,749 of petitioner's claimed $5,000 Schedule C "travel/meals/entertainment" expense and disallowed petitioner's $3,780 Schedule E "commissions" expense. Petitioner did not dispute these adjustments, and, thus, they are considered conceded by petitioner. Rule 34(b)(4); Jarvis v. Commissioner, 78 T.C. 646, 658 n.19 (1982). Also in the notice of deficiency, respondent allowed petitioner additional deductions for Schedule C auto expenses of $2,142, Schedule C depreciation of $2,083, and Schedule E expenses of $166.

Petitioner contends that the disallowed legal expenses were incurred by him while he was engaged in the course and scope of his employment with GBC, and, thus, such expenses are deductible as ordinary and necessary business expenses under section 162(a). Respondent argues, on the other hand, that the disallowed legal expenses were personal expenses of petitioner that are not deductible pursuant to section 262.

Expenses incurred by an employee in the course of employment that are not reimbursed by the employer may be deductible under section 162(a), which allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.[5] Primuth v. Commissioner, 54 T.C. 374, 377 (1970). To qualify for the deduction, an expense must be both ordinary and necessary within the meaning of section 162(a). Deputy v. duPont, 308 U.S. 488, 495 (1940). Whether an amount claimed constitutes an ordinary and necessary expense as an employee business expense is a question of fact to be

---

[5] Petitioner's Federal income tax returns for 1991 and 1992 included a Schedule C for a "Financial Services" activity. This activity, while not addressed at trial, was apparently unrelated to petitioner's employment with GBC. Petitioner was paid a salary by GBC, which he reported on his income tax returns as salary or wage income. The sexual assault matter was not claimed by petitioner to have arisen out of petitioner's Schedule C financial services activity; nevertheless, petitioner's expenses for the defense of the sexual assault charge were claimed as Schedule C deductions. As was noted by counsel for respondent at trial, if petitioner is allowed a deduction for the legal expenses at issue, such expenses would constitute unreimbursed employee business expenses and would be deductible as itemized deductions, subject to the 2-percent limitation of sec. 67(a). Petitioner did not challenge this assertion.

determined from the evidence presented. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933); Allen v. Commissioner, T.C. Memo. 1988-166. Personal expenses are not deductible. Sec. 262.

In United States v. Gilmore, 372 U.S. 39, 48 (1963), the Supreme Court held that the test as to whether legal fees are business or personal expenses depends upon whether the claim arises in connection with the taxpayer's profit-seeking activities or his personal activities. For example, under this "origin of the claim" test, the Supreme Court held that legal expenses incurred to defeat claims arising from a marital relationship were personal and nondeductible. Id. at 51. The Court noted that it is irrelevant whether the taxpayer's income-producing property would be affected by the outcome of the divorce proceeding. See id. at 48.

Petitioner contends that the action that gave rise to the sexual assault claim was his procuring of a hotel room for Ms. Doe, Ms. Johnson, and Ms. Gavirati. Petitioner contends further that his procurement of the hotel room for the ladies was in connection with his business activity because he was complying with a written standard operating procedure of GBC referred to and described at trial as the "take the elevator home" policy (elevator policy). Petitioner argues that the elevator policy required any employee of GBC who noticed that a particular patron at a GBC bar or restaurant was intoxicated should use all means available to encourage that person to "take the elevator home"

and procure for the intoxicated customer a room at a GBC hotel at the reduced employee rate.

Respondent argues that the action that gave rise to the sexual assault claim was not the procurement of the hotel room but, rather, was petitioner's second visit to the hotel room, at which time he and Ms. Doe were alone in the room.[6] This second visit, respondent contends, did not arise because of any business activity of petitioner but, rather, was motivated strictly by personal desires. Respondent argues additionally that, even should the Court determine that the initial procurement of the room was the action that gave rise to the sexual assault claim, petitioner did not procure the room pursuant to GBC's elevator policy but, rather, obtained the room in the hopes of engaging in a romantic interlude with Ms. Doe or one of her companions.

In support of his position, petitioner relies primarily on Clark v. Commissioner, 30 T.C. 1330 (1958), in which this Court held that the taxpayer's expenses incurred in the defense of a criminal sexual assault charge, and amounts paid in settlement of a civil claim for damages arising from an alleged sexual assault, were deductible as ordinary and necessary business expenses. The facts of Clark v. Commissioner, supra, are distinguishable from the facts of this case. Petitioner's reliance in Clark is misplaced.

---

[6] Petitioner admits that he did make a second visit to the hotel room, at which time he and Ms. Doe were alone. The details of this second visit are discussed hereafter.

In <u>Clark</u>, the taxpayer was employed as branch manager in the regional office of a periodical publishing company.  In this position, the taxpayer's duties included, in part, the hiring of solicitors for magazine subscriptions.  In the event an applicant for an outside solicitor's position was a married female, the taxpayer's policy was to interview the applicant's husband to be certain the husband understood the conditions in which his wife would be working and to obtain the husband's approval before employing the applicant.  Every husband of every female applicant was interviewed either by the taxpayer or a person on his staff.

The incident at issue in <u>Clark</u> involved a female applicant for an outside solicitor's position (the applicant).  The taxpayer interviewed the applicant and informed her that her husband would have to be interviewed prior to her being hired.  Subsequently, by telephone, the applicant arranged a specific date and time for the taxpayer to interview her husband at their home because the husband's work schedule made it impractical for him to be interviewed at the taxpayer's office.

The taxpayer arrived at the applicant's home at the agreed date and time and was invited inside by the applicant.  The applicant informed the taxpayer that her husband was not at home, and the taxpayer left a few minutes thereafter without agreeing to employ the applicant.  The taxpayer did not see the applicant again that day.

Later that same day, the applicant swore out a warrant against the taxpayer accusing him of assault with intent to rape.

The taxpayer incurred legal expenses in defending the criminal charges, which were later dropped. Additionally, on the advice of his attorneys, the taxpayer paid a specific amount to the applicant and her husband in release of any potential claim of civil liability in connection with the aforementioned series of events.

In holding that the taxpayer's legal expenses, as well as the settlement amount paid to the applicant and her husband, were deductible by the taxpayer as ordinary and necessary business expenses, the Court stated:

> We think it clear that both matters proximately resulted from petitioner's business as a branch manager, whose duties included interviewing prospective outside subscription solicitors, and, if such prospects were married women, to interview their husbands with the purpose of finding out whether the husbands approved such employment for their wives. Petitioner placed himself in jeopardy by pursuing a proper business objective, i.e., visiting the home of the prospective employee and her husband in order to interview the husband with the objective already described. * * * [Clark v. Commissioner, supra at 1335.]

In Clark v. Commissioner, supra, the Court held that the action giving rise to the claims against the taxpayer were carried out by the taxpayer in the course and scope of his employment and for a legitimate business purpose. In the instant case, there are attendant facts that did not exist in Clark, satisfying this Court that the actions giving rise to Ms. Doe's claim of sexual assault were carried out by petitioner not within the course of

his employment or with a valid business purpose but, rather, were carried out for petitioner's personal purposes.

Petitioner admitted that, after he dropped Ms. Johnson off at the Sports Club, he returned to the hotel room where Ms. Doe was sleeping. He contends he returned out of fear for Ms. Doe's severely intoxicated condition because many years earlier, while on active duty in the U.S. military, a fellow soldier passed out from intoxication and later choked to death. Petitioner feared the same consequence for Ms. Doe and contends he returned to the room for that reason and also to protect GBC from any liability resulting from such an injury to Ms. Doe. Petitioner further contends that, at the time he and Ms. Johnson left Ms. Doe in the room initially, Ms. Doe asked that petitioner return later to check on her.

Petitioner's version of his return to the hotel room differs somewhat from that of Ms. Doe. Petitioner contends that he returned to the hotel room without a key, and, when he knocked on the door, Ms. Doe answered in a stable and coherent condition and invited petitioner in. Petitioner contends further that, upon his entry to the room, Ms. Doe closed the door and started kissing and groping him. Petitioner admits reciprocating Ms. Doe's advances only briefly and then pushed her away because Ms. Doe's friends would be back any minute, and, furthermore, he had a business meeting early in the morning and needed to go home and rest. Petitioner contends he left the hotel room and proceeded directly to his home.

Leaving aside whether petitioner's initial act in procuring the room was primarily for his personal purposes, the Court is satisfied from the record that petitioner's second trip to the hotel room, at which time a sexual offense purportedly occurred, was the action that gave rise to the sexual assault claim, and such action was driven primarily by petitioner's personal motives. The Court so finds. At this second visit, petitioner and Ms. Doe were admittedly alone in the room. If petitioner made this second visit out of his concern for Ms. Doe, he did not indicate that he would do so to Ms. Johnson, whom he had just dropped off at the Sports Bar. On the contrary, petitioner stated to Ms. Johnson that he was going home.

Moreover, while in the room, petitioner admitted to contacts between him and Ms. Doe that were clearly well beyond the realm of ascertaining Ms. Doe's well-being and clearly unrelated to petitioner's trade or business.

GBC's elevator policy in effect at the time of the incident, with which petitioner contends he was complying, stated as follows:

I.    **OBSERVANCE OF INTOXICATION**

    A.    **Previous intoxication**

        1.    Personnel are directed to closely observe all patrons at any Pointe bar.

        2.    Insure that our bartenders are not serving alcoholic beverages to already intoxicated individuals

B.    **Current legal interpretations**

    1.    The Pointe Resort can be held financially liable if one of our customers who is drinking in a Pointe bar causes personal injury to a third party

    2.    The results are disastrous

II.    **GENERAL RULES**

A.    **Anyone who seems intoxicated**

    1.    Bring this to the attention of the bartender and/or manager

    2.    If it is determined that the individual may drive home, then every effort should be made to encourage him/her to either take a taxicab home or "take the elevator home", utilizing the employee preferred rate

B.    **In our legalistic society, it is the responsibility of all management personnel to assist in insuring that legal liability to all of the Pointe and Gosnell entities be held to a minimum**

If petitioner's primary concern was compliance with his employer's elevator policy, petitioner failed to adhere to the initial directive of the policy to insure that bartenders did not serve alcohol to already intoxicated patrons; i.e., Ms. Doe, Ms. Johnson, and Ms. Gavirati.  Petitioner admitted that he believed the women were intoxicated when he first met them.  Nevertheless, not only did petitioner fail to prevent further service of alcohol to the women, he actually provided more alcohol to them, including rounds of "kamikaze shots", which are concentrated shots of alcohol.  Petitioner admittedly contributed to the further inebriation of Ms. Doe, Ms. Johnson, and Ms. Gavirati. Moreover, in the civil suit filed by Ms. Doe, GBC clearly

maintained the position that petitioner was not acting in the course and scope of his employment during any portion of the evening in question. The attorney who represented GBC and related defendants in the civil suit testified at trial. The attorney testified that the settlement by GBC and related defendants should not be interpreted to suggest that petitioner was acting in the scope of his employment during the evening in question, but, rather, the settlement was the result of separate and independent allegations of negligence against GBC and related defendants that involved claims such as failure to properly supervise or reprimand an employee and other similar allegations. The settlement was not based on an acknowledgment by GBC that petitioner was acting within the course and scope of his employment.

Finally, in connection with his defense of the civil suit, petitioner filed a claim for coverage under his homeowner's insurance policy and personal liability umbrella policy (homeowner's policy), which was provided by USAA. The homeowner's policy contained the following specific exclusion from coverage:

> Coverage E - Personal Liability and Coverage F - Medical Payments to Others do not apply to bodily injury or property damage:
>
> a. which is expected or intended by the insured;
>
> b. (1) arising out of or in connection with a business engaged in by an insured. This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty

> rendered, promised, owed, or implied to be provided because of the nature of the business;

Initially, USAA informed petitioner that it was denying coverage under the homeowner's policy and, subsequently, filed a complaint for declaratory judgment asking the Superior Court of Maricopa County, Arizona, to enter a judgment declaring that petitioner was not entitled to coverage under his USAA homeowner's policy for the claims set out in Ms. Doe's civil suit. Petitioner opposed USAA's attempt to deny coverage and claimed that he was entitled to coverage for liability as well as the costs of defending the civil suit. Eventually, USAA dropped its attempt to deny petitioner coverage and paid not only the full amount of the settlement between petitioner and Ms. Doe but also petitioner's expenses in defending the civil suit. Thus, both petitioner and USAA effectively took the position that Ms. Doe's claims that were the subject of the civil suit did not arise out of, nor were they connected with, petitioner's business.

Petitioner has seen fit to alter his position on classifying the origin of the sexual assault claim (i.e., business or personal) based solely on which theory happens to prove financially advantageous to him in any given situation. Unfortunately for petitioner, he has completely failed in his attempt to make transformations reminiscent of a chameleon.

In conclusion, under the Gilmore test, the Court holds that the origin of Ms. Doe's claim against petitioner did not arise from any business or profit-seeking activity or motivation of

petitioner.  Consequently, the Court holds that the legal expenses of $13,737 for 1991 and $31,694 for 1992 disallowed by respondent are nondeductible personal expenses of petitioner. Respondent is, therefore, sustained on this issue.

<u>Decision will be entered</u>

<u>for respondent.</u>